## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

DYCOM INDUSTRIES, INC.,

                **Plaintiff,**

v.

QUANTA SERVICES, INC.,

                **Defendant.**

**ECF CASE**

**Docket No. 16-cv-2396**

### COMPLAINT

Plaintiff Dycom Industries, Inc. ("Dycom"), by and through its attorneys, Seyfarth Shaw LLP, hereby asserts this Complaint against Defendant Quanta Services, Inc. ("Quanta").

### Introduction

1.      Dycom brings this action in response to Quanta's flagrant violations of a non-compete agreement entered into as part of a sale of a business.

2.      On December 3, 2012, Dycom paid Quanta more than $300 million to acquire certain Quanta subsidiaries, through a Stock Purchase Agreement (the "Agreement").

3.      As part of the Agreement, Quanta agreed not to compete against Dycom for four years (*i.e.*, through December 3, 2016), in the business that Quanta sold.

4.      Quanta has breached that agreement, by wrongfully competing against Dycom.

5.      To remedy Quanta's violations, Dycom seeks money damages, injunctive relief, and equitable relief.

### Jurisdiction & Venue

6.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332. The parties are completely diverse. The amount-in-controversy significantly exceeds $75,000.

7.      Venue in this district is appropriate because the Agreement requires that "All actions arising out of or relating to this Agreement" be litigated "exclusively in any New York federal court sitting in the Borough of Manhattan of the City of New York," unless such a court would lack jurisdiction.  (Agreement §11.11.) - Viola

### The Parties

8.      Plaintiff Dycom is a Florida corporation headquartered in Florida.

9.      Dycom is a leading provider of specialty contracting services to the telecommunications infrastructure industry.  These services include the design, installation, repair and maintenance of fiber optic, copper and coaxial cable networks used for video, data and voice transmission and the design, installation and upgrade of wireless communications networks.  Dycom's telecommunications customers include leading telephone companies, cable television multiple system operators and wireless carriers.

10.     Defendant Quanta is a Delaware corporation headquartered in Texas.

### The Facts

11.     In December 2012, Plaintiff Dycom entered into the Agreement with Defendant Quanta.

12.     Under the Agreement, Dycom acquired seventeen Quanta subsidiaries.  Among other things, these subsidiaries provided various telecommunications infrastructure services to telecommunications customers, including the design, installation, repair and maintenance of fiber optic, copper and coaxial cable networks used for video, data and voice transmission and the design, installation and upgrade of wireless communications networks.

13.     Dycom paid Quanta more than $300 million in consideration for the Agreement.

14.    As part of the Agreement, Quanta agreed to a four year Non Competition covenant.  (Agreement § 5.08.)  This was an "essential element" of the Agreement, and Dycom "would not have entered into" the Agreement without it.  (*Id.*)

15.    The Non Competition covenant prevented Quanta from engaging in the business that it was selling to Dycom, defined in the Agreement as "the Business" (and hereinafter referred to as the "Business").  This meant that Quanta agreed to not be in the "business of providing telecommunications infrastructure services to customers in the wireline and wireless telecommunications industry."  (*Id.* § 1.01.)

16.    The transaction contemplated by the Agreement closed on December 3, 2012. Thus, Quanta's Non Competition obligations do not expire until December 3, 2016 (the "Restricted Period").

17.    Despite receiving more than $300 million in total consideration, Quanta has not honored its obligations.  Instead, Quanta has breached its Non Competition covenant, and has done so in a flagrant manner.

### Quanta Attends A "Bid" Meeting At Telecom Customer

18.    A large telecommunications company and Dycom customer (hereafter called the "Telecom Customer") recently announced significant expansion plans, aiming to bring its services to new markets within the United States.   To complete these expansion plans, the Telecom Customer intends to retain contractors to perform a significant amount of telecommunications infrastructure work, including engineering design and construction of a fiber optics network.

19.     In February 2016, the Telecom Customer invited a Dycom to submit a "Request for Proposal" ("RFP"), in connection with its previously announced expansion of its telecommunications services to new markets in the United States.

20.     RFPs are documents which offer contractors the opportunity to prepare proposals explaining why they should be contracted to perform particular services.  A response to an RFP nearly always includes a "bid," setting forth the contractor's price for performing the services requested.

21.     The Telecom Customer RFP invited contractors to submit proposals and bids for the performance of telecommunications infrastructure services.

22.     On information and belief, the Telecom Customer sent similar invitations only to a select group of other companies that perform telecommunications infrastructure services.

23.     The Telecom Customer's RFP invitation included a proposed schedule.  The dates on this schedule fell entirely within the Restricted Period.

24.     The Telecom Customer scheduled a "Pre-bid meeting" so that it could educate select companies regarding how to respond to the RFP.  This was a full-day meeting.

25.     Two employees of Dycom and its subsidiaries (Walt Donovan and John Xanthos) attended the "Pre-bid meeting."  To their surprise, they observed two current Quanta senior executives, George Bradshaw and Tom Cornett, *also* attending the meeting.

26.     Before the meeting began, Mr. Donovan approached Mr. Bradshaw and asked what he was doing at the meeting.  Mr. Donovan reminded Mr. Bradshaw that Quanta's Non Competition obligations did not expire until December 2016.  Flustered, Mr. Bradshaw's answer was dismissive and unresponsive.  Mr. Cornett and Mr. Bradshaw remained in attendance as the

meeting began.  Shortly after the meeting began, Mr. Xanthos noticed that Mr. Bradshaw and Mr. Cornett had left the meeting.

27.     Formulating bids, responding to RFPs, and soliciting potential customers are acts that constitute "engag[ing]" in the Business.

28.     Thus, by attending  the Pre-bid meeting and participating in the RFP process, Quanta engaged in the Business.  Indeed, Quanta's mere *attendance* at the meeting served to compete directly with Dycom, by offering itself as a competitive alternative to Dycom in the bidding process.

29.     Moreover, aside from Quanta, nearly all of the other companies that attended the "Pre-bid meeting" were well-known to Dycom as its direct competitors.  On information and belief, Telecom Customer extended invitations only to a select group of telecommunication infrastructure companies that had the capability to respond to the RFP and provide the services required by the underlying project.

30.     Accordingly, because it received an *invitation* to the meeting, Quanta has evidently been holding itself out as being in the Business for some time.

31.     Furthermore, Quanta would have had no reason to send two senior executives to a full-day meeting at the Telecom Customer, or seek information about the RFP process, if it was not prepared to submit a bid for the work.

32.     Additionally, Mr. Bradshaw and Mr. Cornett clearly knew that, due to Quanta's contractual obligations to Dycom, they should not have attended the meeting.  Mr. Bradshaw and Mr. Cornett left the meeting, presumably as a direct consequence of being identified by Dycom representatives.

**Quanta Builds Its Business By Hiring Away Dycom's Senior Executives**

33.    Without discovery, it is difficult to determine the full extent of Quanta's breaches and wrongful conduct.  But additional facts known to Dycom strongly suggest that Quanta has already built a competitive Business, and is wrongfully competing against Dycom in the Business during the Restricted Period.

34.    In particular, over the past year, Quanta has hired at least four Dycom executives (Dan Miller, Tom Hornick, Tom Harter and Rhys Harter).  Each of these executives formerly worked for Quanta subsidiaries in senior telecommunications infrastructure roles.  Each joined Dycom when their companies were acquired as part of the Agreement.

35.    On information and belief, Quanta offered Mr. Miller and Mr. Hornick exceedingly generous employment packages that demonstrate that Quanta was hiring them away from Dycom for reasons above and beyond their ordinary skills, abilities and other job qualifications.

36.    For instance, Mr. Miller indicated to Dycom that Quanta offered him more than double what he earned at Dycom (which would also be more than double what he had previously made at Quanta at the time of the Agreement, in December 2012).  The offer included a large cash bonus.  Indeed, it was so generous that Mr. Miller voluntarily forfeited restricted stock valued at roughly $400,000 at the time of his resignation that would have vested in less than a year if he had remained employed at Dycom.

37.    Mr. Hornick, similarly, informed Dycom that Quanta offered him an "iron-clad" employment contract which guaranteed him employment for ten years.

38.    Quanta's decisions to hire Mr. Miller, Mr. Hornick, Tom Harter, and Rhys Harter were not unlawful.  Likewise, nothing precludes Quanta from paying its employees enormous

amounts of money, or guaranteeing them employment for a period of time in excess of industry

practice, and even in excess of Quanta's own prior employment guarantees it made to some of

these executives in the past.

39.    However, these individuals have spent their careers acquiring extensive

experience and expertise in the telecommunications infrastructure business.  That is the business

they know, and where they can provide the most value to an employer.  Thus, there is no

conceivable reason explaining *why* Quanta would hire these individuals and provide them with

exceedingly generous employment terms (such as doubling what either Dycom or Quanta had

previously paid them), unless Quanta sought their services for the Business.

40.    Even more concerning, each of these individuals possess intimate knowledge of

Dycom's trade secrets and confidential/proprietary information.  In the competitive positions in

the Business for which Quanta appears to have hired them, these individuals will inevitably

disclose such information, causing Dycom irreparable harm.

41.    Thus, by hiring these individuals, Quanta did not just gain experienced

telecommunications infrastructure executives.  Quanta also acquired access to Dycom's trade

secrets and confidential/proprietary information.  This may further explain why Quanta agreed to

compensate them far in excess of Quanta's prior practices.

42.    On information and belief, Quanta has also induced Mr. Miller, Mr. Hornick, and

Tom Harter to breach their contractual obligations to Dycom.   For example, Mr. Hornick's

employment agreement with a Dycom subsidiary barred him from soliciting Dycom's employees

and consultants to "terminate or materially change [their] employment or consulting

relationship" with Dycom.  Yet, shortly after Mr. Hornick left Dycom, he induced his brother to

resign his employment with Dycom.  Mr. Hornick's breach of his non-solicitation covenant

caused Dycom significant damage.  Among other things, Mr. Hornick's brother possessed

contractor licenses in several states that Dycom needed in order to operate in those states.

Without access to the brother's services, Dycom has been left to find another person with the

same licenses.  On information and belief, Mr. Hornick's brother is now employed by Quanta,

and Quanta is able to use his licenses to seek Business competitive with Dycom -- in further

breach of the Agreement.

43.    Perhaps most glaringly, Quanta publicly flaunts its engagement in the Business

(and, thus, its breach of the Agreement) on the website of at least one of its subsidiaries.

Specifically, the website of Potelco, Inc., a Quanta subsidiary, advertises that this company

"provid[es] telecom design, construction and maintenance services" and has "recently expanded

[its] territory to include nearly every corner of the nation." (*See*

http://www.potelco.net/Telecommunications.html).  The website further declares that this

company performs work "in all aspects of fiber-optic design, installation, and maintenance."

(*See* http://www.potelco.net/Fiber%20Optics.html).  This kind of work is clearly Business that

the Agreement prohibits Quanta and its subsidiaries from engaging in.

**Quanta Spurns Dycom's Resolution Efforts**

44.    On March 2, 2016, Dycom sent Quanta a letter.  Dycom's letter informed Quanta

that it intended to commence legal action, unless Quanta could provide written assurances

sufficient to ameliorate Dycom's concerns.

45.    On March 10, 2016, Quanta responded to Dycom's letter.  Quanta's response

consisted of nothing but attempts to misdirect Dycom from the issues raised in Dycom's letter,

and tellingly did not address the key concern that Dycom had raised: Quanta's attendance at the

Telecom Customer's Pre-bid meeting.

46.     At its heart, Quanta's response noted - correctly - that its Non Competition obligations contained certain limited carve-outs.  But Quanta did not actually claim, in its response, that its participation in the Telecom Customer's Pre-bid meeting or RFP process fell within any of those carve-outs.  And for good reason: any such argument would be totally preposterous.

47.     For example, Quanta noted that its Non Competition obligations apply only within the United States.  But Quanta did not dispute that the Telecom Customer project encompasses work entirely within the United States.

48.     Similarly, Quanta pointed out that the Agreement permits companies *acquired by Quanta after December 3, 2012* to conduct up to $75 million in Business.  Yet Quanta has owned the subsidiary whose representatives attended the Telecom Customer Pre-bid meeting *since 1998*.  And the Telecom Customer Pre-bid meeting concerned a project far in excess of $75 million.

49.     Quanta further argued that it hired Mr. Hornick, Mr. Miller and Rhys Harter solely to work on Quanta projects outside the United States.  But Dycom knows this to be false.

50.     Indeed, a member of Quanta's business development team errantly e-mailed Mr. Hornick at his former Dycom e-mail address (copying Mr. Miller and Tom Harter) to discuss ways in which they could assist Quanta in copying Dycom's promotional materials directed towards the United States market.

51.     On March 15, 2016, Dycom replied to Quanta's letter.  Dycom noted that Quanta's letter failed to address Dycom's concerns.  Dycom gave Quanta one final opportunity to avoid litigation.  Dycom asked Quanta for credible evidence within five business days that its

attendance at the Pre-bid meeting and hiring of Dycom's employees did not breach the Agreement.  Quanta did not respond to this letter.

52.     Quanta's failure to explain its breaches - when faced with the threat of legal action - further confirms what the facts evidence: that Quanta has plainly "gun jumped" its Non Competition obligations by engaging in the Business well before those obligations expire in December 2016.

53.     Perhaps even worse, Quanta has not simply failed to explain its actions, or ignored Dycom's resolution efforts.  Instead, less than two weeks after Quanta's evasive March 10th response, Quanta committed *additional* breaches of the Agreement.  At this time, Dycom received yet *another* e-mail errantly directed to Mr. Hornick's former Dycom e-mail address.  In this e-mail, Mr. Miller sought Mr. Hornick's input about attending an industry tradeshow in Missouri where they could potentially meet new customers and solicit telecommunications infrastructure Business within the United States.

54.     Notably, Mr. Miller, Mr. Hornick, and Tom Harter owe non-compete obligations to Dycom that have not expired.  Their attendance at industry trade shows and other efforts to solicit business for Quanta would flagrantly breach those violations.  Further, on information and belief, Quanta has induced them to breach those obligations.

### **Damages and Relief**

55.     Dycom is entitled to money damages due to Quanta's breaches.  This amount will be determined at trial, but far exceeds $75,000.  Among other things, the Non Competition term was an essential element of the Agreement that was worth significant value to Dycom.  If Dycom had known that Quanta would fail to fulfill its obligations under the Agreement, Dycom would not have agreed to pay more than $300 million to acquire the subsidiaries.  If it would have

agreed to the transaction at all, it would have only agreed to pay far less.  Dycom is entitled to recover the economic value of the lost Non Competition period -- in addition to money damages it has sustained due to Quanta's unlawful breaches and premature competition.

56.   Additionally, Section 11.10 of the Agreement recognizes that Dycom would be "irreparably damaged" if Quanta failed to specifically perform its obligations under the Agreement.  The Agreement thus entitles Dycom to "temporary, preliminary and injunctive relief" "in addition to any other right or remedy to which [it] hereto may be entitled, at Law or in equity."  As a result, Dycom is entitled to immediate injunctive relief against Quanta's on-going violations of the Agreement.

57.   Dycom further demands its attorneys' fees, costs, and any other relief that the Court deems just and proper, including equitable relief (such as an extension of Quanta's Non Competition obligations to cover the period of its breach).

## Count One:  Breach of Contract

58.   Dycom repeats and re-alleges the allegations in paragraphs 1 through 57 of this Complaint.

59.   By engaging in the Business prior to December 3, 2016, Quanta has breached the Stock Purchase Agreement's Non Competition obligations.

60.   Dycom has been irreparably and monetarily damaged by Quanta's breaches, in an amount to be proven at trial.

## Count Two:  Indemnification (Pled In the Alternative, If Necessary)

61.   Dycom repeats and re-alleges the allegations in paragraphs 1 through 60 of this Complaint.

62.     The Stock Purchase Agreement, at Article IX, entitles Dycom to indemnification from Quanta due to Quanta's breaches of its Non Competition obligations.

WHEREFORE, Dycom hereby demands:

a)     Money damages and/or indemnification, in an amount to be proven at trial;

b)     A temporary, preliminary, and permanent injunction against further breaches by Quanta;

c)     Its attorneys' fees and costs;

d)     Any other relief that the Court deems just and proper, including equitable relief

(such as an extension Quanta's Non Competition obligations to cover the period of its breach).

Dated: New York, New York
       March 31, 2016

                            SEYFARTH SHAW LLP


                            By:_____/s/ Jacob Oslick_____
                                    Michael F. Marino
                                    Gary Glaser
                                    Jacob Oslick
                                    mmarino@seyfarth.com
                                    gglaser@seyfarth.com
                                    joslick@seyfarth.com
                                    620 Eighth Avenue
                                    New York, New York  10018
                                    Telephone:  (212) 218-5500
                                    Facsimile:  (212) 218-5526
                                    Attorneys for Plaintiff