THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

DYCOM INDUSTRIES, INC.,

                    Plaintiff,

          v.

QUANTA SERVICES, INC.,

                    Defendant.

Case No. 16 Civ. 2396 (VM)

AMENDED COMPLAINT

Plaintiff Dycom Industries, Inc. ("Dycom"), upon knowledge of its own conduct and

otherwise upon information and belief, alleges for its amended complaint against defendant

Quanta Services, Inc. ("Quanta") as follows:

## INTRODUCTION

1.      In 2012, pursuant to a Stock Purchase Agreement (the "Agreement"), Dycom

purchased Quanta's equity interests in companies that were engaged in the telecommunications

infrastructure services business in the United States, along with other assets used by Quanta in

connection with that business.  Dycom paid more than $300 million under the Agreement, a

substantial portion of which it attributed to the goodwill that it was acquiring.

2.      A key component of the Agreement was Quanta's express promise to refrain from

competing with Dycom in the U.S. telecommunications infrastructure business for four years

after the sale – i.e., until December 3, 2016.  Yet Quanta has not complied with its obligations.

Among other things, Quanta has already formed a new subsidiary to provide telecommunications

infrastructure services in the United States, poached key Dycom executives and other employees

to staff that business, advertised its telecommunications business online, and actively

participated in the process of bidding on projects for a major telecommunications customer.  The full scope of Quanta's conduct will only be known through discovery in this action.

3.      As part of the Agreement, Quanta also agreed not to solicit or hire Dycom employees during the first three years after the sale – i.e., until December 3, 2015.  But in breach of its obligations, Quanta solicited the head of a Dycom telecommunications engineering subsidiary before the non-solicitation covenant expired, and hired him at least as early as August 2015.  Quanta then used the hiring of that employee as a springboard to make additional raids on Dycom's employees.

4.      Quanta similarly agreed that it would prevent its employees from making use of proprietary information and trade secrets belonging to Dycom and the entities it acquired in the transaction.  Quanta nonetheless has hired numerous Dycom employees for positions in which they inevitably have used, and will continue to use, Dycom's confidential and proprietary information and trade secrets – including in furtherance of Quanta's unlawful competition in the telecommunications infrastructure services business.  In doing so, Quanta has not only violated its own confidentiality obligations in the Agreement, but also tortiously induced the employees it hired to violate their separate contractual non-compete and confidentiality obligations to Dycom.

5.      Finally, Quanta has made clear that it intends to engage in full scale competition with Dycom, including by soliciting customers of the businesses that were transferred to Dycom as part of the 2012 transaction.  Indeed, Quanta has already actively inserted itself into a bidding process to compete for major contracts with a fiber-optic network operator that was a Quanta customer as of the time of the 2012 sale.  Under New York law, as held by the New York Court of Appeals, Quanta is permanently barred from soliciting this and other former customers.  *See Mohawk Maint. Co. v. Kessler*, 52 N.Y.2d 276 (1981).

6.      Quanta's conduct has caused and threatens to cause severe irreparable harm to Dycom.  As a result, Dycom seeks indemnification for the losses it has suffered, injunctive relief barring Quanta from further engaging in prohibited competition, and declaratory and injunctive relief prohibiting Quanta from actively soliciting the customers of the telecommunications infrastructure services business it sold to Dycom in 2012.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332.  The parties are completely diverse and the amount in controversy exceeds $75,000, as described in more detail below.

8.      Venue in this district is appropriate.  The Agreement requires that "[a]ll [a]ctions arising out of or relating to this Agreement" be litigated "exclusively in any New York federal court sitting in the Borough of Manhattan of the City of New York" that has jurisdiction.

## PARTIES

9.      Dycom is a Florida corporation with its principal place of business in Florida.

10.     Dycom is a leading provider of specialty contracting services to the telecommunications infrastructure industry in the United States and Canada.  These services include the design, installation, repair, and maintenance of fiber optic, copper, and coaxial cable networks used for video, data, and voice transmission, as well as the design, installation, and upgrade of wireless communications networks.  Dycom's telecommunications customers include leading telephone companies, cable television providers, multiple system operators, and wireless carriers.

11.     Quanta is a Delaware corporation with its principal place of business in Texas.

## FACTS

### The Agreement

12.     In November 2012, Quanta and Dycom entered into the Agreement, which provided for the sale of Quanta's ownership interests in subsidiaries that engaged in telecommunications infrastructure services operations in the United States, as well as other assets related to those operations.  The total amount of consideration given by Dycom exceeded $300 million.  In its purchase-price accounting in connection with the transaction, Dycom allocated nearly $160 million in value to goodwill and the customer relationships it was acquiring.

13.     As part of the Agreement, Quanta agreed to a three-year restriction on its ability to solicit and hire employees of Dycom or any of the entities acquired by Dycom in the sale. Quanta also agreed that "[f]or a period of four years after the Closing, none of the Sellers or their Affiliates shall engage, directly or indirectly, in the Business."  The "Business," as defined in the Agreement, "means the business of providing telecommunications infrastructure services to customers in the wireline and wireless telecommunications industry as well as the cable television industry including the design, installation, repair and maintenance of fiber optic, copper and coaxial cable networks used for video, data and voice transmission and the design, installation and upgrade of wireless communications networks" within the United States.

14.     Recognizing the importance of the non-compete covenant to Dycom, Quanta acknowledged in the Agreement "that the covenants of the Sellers set forth in this Section 5.08 are an essential element of this Agreement and that, but for the agreement of the Sellers to comply with these covenants, the Purchaser would not have entered into this Agreement."

15.     Quanta further agreed that it would cause its employees and officers to treat and hold as confidential "all information relating to trade secrets, processes, patent applications, product development, price, customer and supplier lists, pricing and marketing plans, policies

and strategies, details of client and consultant contracts, operations methods, product development techniques, business acquisition plans, new personnel acquisition plans and all other confidential or proprietary information with respect to each" of the acquired businesses. The Agreement permits Quanta employees to use such information "retained in their unaided memory," subject to a key exception: they may not rely on such information where doing so would violate another provision of the Agreement, including the covenant not to compete.  In addition, while the confidentiality restrictions in the Agreement generally apply for the first three years following the sale, this temporal limitation does not apply "with respect to trade secrets."

16.     Finally, under well-established New York law, the Agreement contains an implied covenant requiring Quanta "to refrain from soliciting former customers" of the businesses it sold. *Mohawk*, 52 N.Y.2d at 284.  Under New York law, this covenant is of "indefinite duration."  *Id.*

17.     The transaction closed on December 3, 2012.  Thus, Quanta's covenant not to solicit or hire employees lasted until December 3, 2015.  Its covenant not to compete in the telecommunications infrastructure services business in the United States remains in effect until December 3, 2016.  And the implied covenant on Quanta's part not to solicit its former customers extends indefinitely under New York law.

18.     Despite receiving hundreds of millions of dollars in consideration, Quanta has not honored its obligations.  Although the full extent and details of Quanta's unlawful behavior are exclusively known to Quanta and will only be fully uncovered through discovery, Dycom already has become aware of facts indicating that Quanta is wrongfully engaged in competition with Dycom in the U.S. telecommunications infrastructure business.  Moreover, Quanta appears intent on soliciting the customers of the businesses it sold to Dycom, in violation of its obligations under the Agreement and New York law – including as demonstrated by its active

participation in a bidding process for major contracts with a former telecommunications customer.

## Quanta Solicits and Hires Dycom's Employees

19.     On February 28, 2015, Tom Harter, the president of Dycom's subsidiary Engineering Associates LLC ("Engineering Associates"), suddenly resigned – thereby forfeiting nearly $900,000 in deferred compensation that would have vested over the next four years, including over $400,000 that would have vested if he had remained at Dycom through the end of 2015.  Upon information and belief, Tom Harter was contacted and solicited by Quanta or its representatives before his resignation.  Absent such contact and solicitation, Tom Harter would not have resigned from Dycom and forfeited such a large amount of money.

20.     Engineering Associates was one of the entities sold by Quanta to Dycom in the 2012 transaction; it provides design services in the United States for telecommunication technologies, such as fiber optics, high-speed internet, digital wireless networks, and two-way radio systems.  Despite Quanta's agreement not to solicit or hire employees of the transferred businesses until December 3, 2015, Quanta hired Tom Harter as its Vice President of Engineering Services at least as early as August 2, 2015.

21.     As demonstrated below, Quanta's solicitation and hiring of Tom Harter set off a chain of other events that have resulted in the departure of numerous Dycom employees as part of Quanta's efforts to steal back the goodwill that it sold to Dycom in the 2012 transaction.

22.     After rejoining Quanta, Tom Harter recruited his son, Rhys Harter – also a Dycom employee – to leave Dycom and rejoin Quanta as well.  Rhys Harter, together with other Quanta personnel, have actively sought to recruit additional mid-level employees from Engineering Associates, telling them that they could perform the same kind of

telecommunications engineering work at Quanta that they were performing on behalf of Dycom. For example, Kelly Savage, a manager and design engineer for Engineering Associates, received a letter from Quanta on March 28, 2016, sent on behalf of Rhys Harter, offering her a position as senior designer "based out of our Telecom office in Metropolitan Atlanta, GA."  In the course of such recruiting efforts, Quanta has been holding itself out as a participant in the telecommunications infrastructure services business, notwithstanding that Quanta is contractually prohibited from engaging in such business until December 3, 2016, at the earliest.

23.     By hiring Tom Harter, Quanta gained access not only to his extensive experience in the U.S. telecommunications infrastructure business, but also the confidential and proprietary information he acquired while the head of Engineering Associates, including customer contacts, pricing structure and information, bid formulation methods, and innovative business management techniques.  In addition, through Tom Harter, Quanta gained access to his knowledge about the employees that Quanta has been soliciting and hiring.

24.     It would be impossible for Tom Harter *not* to rely on proprietary information and trade secrets in his new position.  Indeed, Quanta itself had expressly agreed with Harter in his employment agreement – which was executed before the 2012 transaction, when Quanta still controlled  Engineering Associates – that "in light of [Tom Harter's] position with [Engineering Associates] and his access to Proprietary and Confidential Information, it can be presumed that Employee will inevitably disclose such Proprietary and Confidential Information if Employee subsequently obtains similar or comparable employment with one of the competitors" of his employer and its affiliates.

25.     On information and belief, Tom Harter's new position at Quanta is sufficiently similar and comparable to the one he held while at Engineering Associates that he is inevitably

using or disclosing confidential information and trade secrets to assist Quanta in its efforts to compete with Dycom in the domestic telecommunications infrastructure business, in violation of the Agreement.

26.     Beginning in late 2015, Quanta accelerated its hiring of Dycom telecommunications personnel (including more of Quanta's former employees).  Quanta's rapid buildup of staff only makes sense based on a decision to compete in the U.S. telecommunications infrastructure industry notwithstanding its still-operative covenant not to compete.  And Quanta would not have begun its hiring spree as early as it did unless it intended to begin its competition long before December 3, 2016 – that is, long before the end of the four-year non-compete term expressly agreed to in the Agreement.

27.     On December 22, 2015, Dan Miller resigned from his position as Dycom's Senior Director of Operations.  Miller had previously worked for Spalj Construction Company, a Quanta subsidiary that Dycom acquired in the 2012 transaction.  Miller spent a significant portion of his career – at Quanta and at Dycom – acquiring experience and expertise in the telecommunications infrastructure business in the United States.  And while working for Dycom, Miller played a key role in strategic client development and bidding on new projects.  He therefore became intimately familiar with Dycom's highly confidential, sensitive, and proprietary information, including customer contacts, pricing information, bid formulation methods, innovative business management techniques, and patented "microtrenching" technology that allows for faster, less disruptive, and cheaper installation of fiber.

28.     Demonstrating Quanta's zeal to regain the domestic telecommunications business that Quanta sold to Dycom, Quanta offered Miller an exceedingly generous employment package to rejoin:  more than double the salary he earned at Dycom (and more than double what he had

previously made at Quanta at the time of the 2012 transaction).  Upon information and belief,

Quanta's employment offer also included a large cash bonus – one that was so generous that

Miller was persuaded to forfeit Dycom restricted stock valued at around $400,000 that would

have vested in less than a year if he had remained at Dycom.

29.     Shortly after Miller joined Quanta, he made clear to his former colleagues at

Dycom that he would be involved in Quanta's reentry into the telecommunications infrastructure

business.  In early 2016, he told Rod Kuenzi, the president of North Sky Communications LLC,

a Dycom subsidiary, that Quanta had ordered multiple trucks to use in its telecommunications

infrastructure business.

30.     In rehiring Miller, Quanta bought access to Miller's U.S. telecommunications

infrastructure expertise, as well as his knowledge of Dycom's proprietary information and trade

secrets.  Before leaving Dycom, Miller sent to his personal AOL email account a host of Dycom

business records and communications containing sensitive and proprietary pricing information.

Miller's emailing of documents to himself was not merely to facilitate his working from outside

the office: Dycom's email system can be accessed from any computer with an internet

connection.  Miller would have had no reason to divert sensitive business documents to a

personal email account unless he had the intention of accessing them after leaving Dycom's

employ.

31.     Miller's transfer of sensitive information to Quanta did not stop there.  One month

after joining Quanta, in January 2016, Miller requested that the cellphone number he had used to

conduct Dycom business be "ported" over to his new Quanta business phone.  This would enable

him to retain confidential customer contact information and continue to receive calls from

Dycom customers, thus making it substantially easier for him to solicit Dycom's customers and

build customer relationships on behalf of Quanta.  The port was approved by Tom Hornick – a

Dycom executive who would depart for Quanta only a few weeks later, on February 12, 2016.

      32.    Tom Hornick, like Miller, had worked for Spalj at the time of its acquisition by

Dycom in 2012; he then became president of Dycom's subsidiary, Fiber Technologies Solutions,

LLC ("Fiber Technologies").  Tom Hornick, too, had spent his career amassing substantial

experience and expertise in the U.S. telecommunications infrastructure business.  And as the

highest-ranking officer of Fiber Technologies, Tom Hornick gained deep familiarity with

Dycom's proprietary methods and information, such as customer contacts, pricing structure and

information, bid formulation methods, and innovative business management techniques.  If Tom

Hornick were to have responsibilities at another employer substantially similar to those he had

while at Fiber Technologies, it is inevitable that he would end up relying on that proprietary

information.  On information and belief, Hornick's responsibilities in his new job at Quanta are

similar and comparable to the responsibilities he had at Fiber Technologies, such that he is

inevitably using Dycom trade secrets and knowledge of Dycom's customer relationships in

furtherance of Quanta's unlawful competition.

      33.    Quanta lured Tom Hornick away, and gained the benefits of his extensive

experience and knowledge of proprietary information, by offering him an "iron clad" contract

guaranteeing him ten years of employment.  These terms far exceed the industry norm, thus

demonstrating Quanta's commitment to reestablishing a very substantial presence in the

telecommunications infrastructure business in the United States.

      34.    Tom Hornick has since been actively involved in seeking to hire away additional

Dycom personnel on behalf of his new employer.  Upon information and belief, Tom Hornick

and Quanta have been successful in hiring away Gary Hornick, Tom Hornick's brother, who

resigned on April 1, 2016, taking with him valuable specialty contractor licenses that he holds in seven states in the United States.

35.     Also on April 1, 2016, Tonya Dobson, a contract administrator for Fiber Technologies, resigned to take a new job at Quanta.  On April 11, 2016, three additional Engineering Associates employees left for Quanta after being solicited by Rhys Harter and other Quanta personnel:  drafter and designer Christopher Brown, as well as field engineers Johnny Rushing and Karen Rushing.  All of these hirings by Quanta away from Dycom were set in motion by Quanta's hiring of Tom Harter.

36.     Quanta's hiring of Dycom's employees, and its failure to prevent those employees from using and disclosing proprietary information, is not only a violation of Quanta's contractual obligations under the Agreement – it also amounts to tortious interference with those individuals' employment agreements with Dycom.  The employment agreements with Tom Harter, Tom Hornick, and Dan Miller contain their own covenants, on the part of the employees, not to compete with Dycom for a period of time after terminating employment, and not to use proprietary information belonging to Dycom.

37.     Quanta knows of these contractual obligations: Tom Harter's and Tom Hornick's agreements were negotiated and signed before December 2012, while the employer subsidiaries were still under Quanta's control.  Quanta also became privy to the contents of Dan Miller's post-closing employment agreement while carrying out its obligation under the Agreement to "use reasonable efforts to cooperate with Dycom and the Purchaser in obtaining executed Employment Documents."  In any event, restrictions on an employee's post-termination competition and use of proprietary information are standard in the telecommunications

infrastructure services business; Quanta therefore knew that it was hiring away Dycom employees who were subject to such restrictions.

38.     Notwithstanding its knowledge that the Dycom employees owed non-compete and confidentiality obligations to Dycom, Quanta has induced them to violate these obligations in the course of their new employment at Quanta, and in furtherance of Quanta's unlawful competition in the telecommunications infrastructure services business.

**Quanta Promotes its Telecommunications Services and Forms a "New Telecom Division"**

39.     There can be little doubt about the reason for Quanta's extensive efforts, over more than a year, to amass a robust team of U.S.-based telecommunications professionals: it is, and has been, actively engaged in the business of providing telecommunications infrastructure services in the United States, in violation of the non-compete covenant in the Agreement.

40.     The timing of Quanta's reentry into the telecommunications space is telling. After selling its telecommunications business to Dycom in 2012, Quanta's remaining business focused primarily on providing infrastructure services in the electric power, oil, and natural gas sectors.  As oil and gas prices have plummeted in recent years, infrastructure services geared toward these industries have become less lucrative.  Meanwhile, the telecommunications industry has experienced significant growth, making it more attractive to infrastructure services providers.  These economic realities help explain why Quanta was motivated to begin competing in the telecommunications industry again, well before the non-compete covenant in the Agreement expired.

41.     That Quanta has been acting on this motive is corroborated by substantial additional evidence of competition.  One of Quanta's subsidiaries, Potelco, boasts on its website

(http://www.potelco.net/) about the telecommunications services it provides in the United States. For example:

- The homepage announces that "Potelco is your partner in delivering power and telecommunications to the people of the Pacific Northwest and beyond through our complete family of services."

- The home page further declares that "[o]ur services include transmission and distribution power lines, specialized civil construction, fiber optic systems, as well as aerial and underground telecommunications."

- A link entitled "telecommunications" directs to a page with a promotional video that refers to, among other things, services related to telecommunications, fiber deployment, broadband, cable, and telephony.

- A link called "fiber optics" directs to a page declaring that "Potelco is a pioneer and innovator in all aspects of fiber-optic design, installation, and maintenance. Our team of engineers, technicians, and installation crews is among the most experienced and proficient in the industry."

- The fiber optics page goes on: "We can provide everything you need; from materials purchasing, acceptance and field testing, design, fiber installation, and fiber splicing.  You can count on us to be there down the road to provide support and maintenance of your system."

42.      Potelco is not the only entity through which Quanta apparently has been engaged in the telecommunications infrastructure business.  In February 2016, Quanta formed Quanta Telecommunication Services, LLC ("Quanta Telecom"), a Delaware limited liability company of which Quanta is the sole member.  Quanta Telecom is registered to do business in multiple jurisdictions in the United States.  Its corporate filings describe Quanta Telecom as "an operating company for [a] new telecom division," and state that the company will provide "engineering, construction, and related telecommunications services."

43.      Quanta Telecom is developing promotional materials to flaunt its telecommunications infrastructure business.  A member of Quanta's business development team, Nick Knievel, sent an email on March 4, 2016, to his colleagues Tom Hornick, Dan Miller, and Tom Harter (all former Dycom employees), urging them to copy an online promotional video

produced by Dycom's subsidiary, Ervin Cable Construction LLC.  But Knievel errantly directed

the communication to Hornick's old Dycom email address, thus revealing Quanta's intentions to

Dycom.  In the email, Knievel stated:  "I believe that a Quanta telecom Services video – which is

basically a commercial – like this Ervin one which they produced on their own – is really great.

More important than brochures.  Imagine us being able to open our ipad or put on screen in a

conference room in a meeting etc."

44.     Quanta Telecom also is actively seeking to cultivate relationships with

telecommunications customers.  In yet another email accidentally forwarded to Tom Hornick's

old Dycom email address, Quanta employee Dick Rogers informed Dan Miller on March 25,

2016, about an upcoming roadshow in Missouri for Calix Inc., a provider of hardware for

broadband communications systems and software for fiber- and copper-based networks in North

America.  In forwarding the invitation to the roadshow, Rogers observed that "[t]hese are good

places to make contacts with the folks that are looking at building fiber networks for a city or

municipal electric utility."  Rogers explained that any city or municipality that was interested in

Calix's products might be "working on a fiber network plan."

45.     Quanta's intention to attend such industry events and develop customer

relationships in the telecommunications industry was not new.  In late December 2015, Quanta's

Knievel sent a text message to Dycom's Walt Donovan, saying "I'll start seeing u at the

tradeshows."

**Quanta Participates in Bidding Processes for Large Telecommunications Projects**

46.     Quanta has actively inserted itself into competitive bidding processes for

multimillion-dollar telecommunications infrastructure projects in the United States, thus directly

competing against Dycom for lucrative contracts.

47.     A large telecommunications company and Dycom customer (to protect confidentiality, it is referred to herein as "Telecom Customer") recently announced significant expansion plans, aiming to bring fiber optic networks to multiple new markets in the United States.  To complete these expansion plans, Telecom Customer announced that it was seeking to retain contractors to perform a significant amount of telecommunications infrastructure work, including engineering, design, and construction of a fiber optic network.

48.     Telecom Customer has a relationship, dating back several years, with Dycom's subsidiary Golden State Utility Co. ("Golden State"), which Dycom acquired from Quanta in the 2012 transaction.  Golden State provided telecommunications infrastructure services to Telecom Customer at least as early as 2010, including in connection with the construction of a fiber network that (on information and belief) is the prototype for the very networks that are the subject of Telecom Customer's recently announced expansion plans.  Golden State performed services for Telecom Customer throughout 2011 and 2012, and continued to do so after Dycom acquired Golden State from Quanta in December 2012.

49.     In February 2016, as part of its expansion plans, Telecom Customer invited Dycom to respond to a "Request for Proposal" ("RFP") for a large project in California.  RFPs are documents that offer contractors the opportunity to prepare proposals explaining why they should be contracted to perform particular services.  A response to an RFP nearly always includes a bid setting forth the contractor's price for performing the services requested.  On information and belief, Telecom Customer sent similar invitations only to a select group of other companies that perform telecommunications infrastructure services in the United States.  As described below, Quanta was one of the invitees; plainly, Telecom Customer believes that

15

Quanta is engaging in the business of providing telecommunications infrastructure services in the United States.

50.    The RFP issued in February included a schedule with dates that fall entirely within the period covered by the non-compete covenant in the Agreement.  It is reasonable to expect that the winning bidder will begin performing work for Telecom Customer well in advance of December 2016.  Moreover, the value of the contracts being sought will be hundreds of millions of dollars.

51.    Telecom Customer scheduled a full-day "pre-bid meeting" for February 19, 2016, so that it could provide prospective bidders with information regarding how to respond to the RFP.  Nearly all of the companies represented at the meeting were well-known to Dycom as its direct competitors.

52.    Two Dycom employees (Walt Donovan and John Xanthos) attended the meeting. There, they observed two Quanta senior executives, George Bradshaw and Tom Cornett, also attending the meeting.  Before the meeting began, Donovan approached Bradshaw and asked why he was present, reminding him that Quanta's non-compete obligations did not expire until December 2016.  Flustered, Bradshaw gave a dismissive and unresponsive answer.

53.    In April 2016, Telecom Customer issued an additional RFP for a similar project in a major metropolitan area in the United States.  Dycom received the April RFP, along with an online questionnaire asking whether it intended to respond.  The webpage for the questionnaire showed the names of the other recipients of the April RFP, which included Potelco, the Quanta subsidiary that advertises its telecommunications infrastructure services in the Pacific Northwest (as described above).  All of the other recipients were known to Dycom as direct competitors in the telecommunications infrastructure industry; moreover, the questionnaire website revealed

that eight out of the nine recipients (including Dycom) responded that they intended to participate in the RFP process.  Thus, again, the Telecom Customer was under the impression that Quanta (this time acting through Potelco) is engaged in the business of providing telecommunications infrastructure services in the United States.  On information and belief, Potelco was among the invitees that gave an affirmative response to the questionnaire.

54.     As with the February RFP, Telecom Customer has announced that it will hold a pre-bid meeting in early May for the April RFP.  Upon information and belief, based on the schedule in the April RFP, the winning bidder for the contract will be required to begin performing services for Telecom Customer by June or July 2016, and the value of the contract will be hundreds of millions of dollars.

55.     Because of the nature of the work involved, the telecommunications infrastructure services business involves far more than the actual provision of services to customers.  Among many other things, a provider must maintain customer relationships; distribute promotional materials and build a reputation and brand; design and engineer technology that will assist with the provision of services; and, of course, participate in competitive bidding processes to win contracts, including by responding to RFPs.  All of these activities, which are necessary prerequisites to getting hired by customers, are encompassed in "the business" of providing telecommunications infrastructure services.

56.     Thus, by attending the pre-bid meeting held by Telecom Customer – and holding itself out as an alternative to Dycom in the bidding process – Quanta engaged in "the business" restricted by the non-compete covenant in the Agreement.

57.     Moreover, the fact that Quanta received the RFPs and invitations to attend pre-bid meetings demonstrates that Quanta has successfully been holding itself out as a viable player in

the telecommunications infrastructure business for some time.  In addition, Quanta would have had no reason to send two senior executives to a full-day meeting hosted by Telecom Customer, or to seek information about the RFP process, if it was not prepared to submit a bid for the work.

58.     Quanta's competition for Telecom Customer's business not only is a violation of the non-compete covenant under the Agreement.  It also constitutes active solicitation of Telecom Customer – a client of a business Quanta sold to Dycom in 2012 – and thus a violation of the implied covenant under New York law prohibiting a seller of a business from trying to reclaim the goodwill that it conveyed.

59.     Upon information and belief, Quanta (through its various subsidiaries) is already set on a course that has resulted, or will result, in tens (if not hundreds) of millions of dollars in revenue for 2016.  Discovery will be required to determine the full extent of Quanta's competitive activities in violation of the Agreement.

<u>**Quanta Spurns Dycom's Resolution Efforts**</u>

60.     On March 2, 2016, Dycom sent Quanta a letter stating that it intended to commence legal action unless Quanta could provide written assurances sufficient to ameliorate Dycom's concerns.  Among other things, Dycom asked Quanta to provide credible evidence that it was not engaging in the Business (as defined in the Agreement); that employees it hired away from Dycom were not engaged in competitive work, or making contact with or attempting to solicit Dycom's employees or customers; and that Quanta has not appropriated Dycom's confidential information and will not do so in the future.

61.     On March 10, 2016, Quanta sent a response to Dycom's letter.  The response was signed by Brett Schrader, who serves as Deputy General Counsel to Quanta, but who also is listed in corporate filings as an officer of Quanta Telecom – the "new telecom division" formed

by Quanta in February 2016 to provide "engineering, construction, and related telecommunications services" in the United States, as described above.  The response letter conspicuously declined to provide the assurances and evidence that Dycom requested.  Instead, Quanta's letter largely was limited to reciting narrow carve-outs from the non-compete covenant in the Agreement.  Quanta did not actually claim that the misconduct identified by Dycom – including Quanta's participation in Telecom Customer's RFP process – fell within any of those limited exceptions.

62.    For example, Quanta argued that its non-compete obligations apply only within the United States.  Quanta did not dispute, however, that the Telecom Customer projects encompass work entirely within the United States.  Likewise, Quanta insisted that it hired Dycom personnel solely to work on international projects, such as in Latin America.  Dycom knows Quanta's statement to be false, thereby evidencing Quanta's willingness to lie in order to avoid discovery of its breaches of the agreement.  For example, contrary to Quanta's claim that the former Dycom employees have been hired only for international projects, Knievel's March 4, 2016, email to Tom Hornick, Dan Miller, and Tom Harter urged the creation of promotional materials for Quanta Telecom, an entity registered to do business in the United States; and Rogers' March 25, 2016, email to Miller (which Miller forwarded to Tom Hornick), encourages attendance at an industry roadshow in Missouri for the purpose of cultivating relationships with customers in the United States.

63.    Quanta also stated that under the Agreement, Quanta shall not be "deemed to be in violation" of the non-compete covenant "as a result of . . . acquiring" a company that engages in the Business, so long as the annual revenues derived by that company from the Business

remain below specified thresholds.  Yet Quanta failed to address that the competitive conduct identified by Dycom does not consist of "acquiring" any entity.

64.     Quanta similarly observed that it could not be "deemed to be in violation . . . as a result of . . . any other services performed for any telecommunications customer(s) contributing revenues not in excess of $10 million in any fiscal year of Quanta."  But Quanta ignored that Dycom does not seek to hold Quanta liable "as a result of" deriving de minimis revenue.  Rather, Dycom alleges that Quanta has improperly engaged in "the business" of providing telecommunications infrastructure services by, among other things, actively participating in Telecom Customer's RFP process and holding itself out as a direct competitor of Dycom – in connection with projects that are expected to generate hundreds of millions of dollars in revenue for the winning bidder.

65.     Indeed, it is disingenuous for Quanta to respond to Dycom's allegations of unlawful competition by citing the exception for deriving less than $10 million in revenue.  Given Quanta's size and capabilities, *any* telecommunications contract that Quanta would expend time and effort to bid on would be expected to generate far more than $10 million in revenue.  In any event, upon information and belief, discovery will reveal that Quanta is already providing telecommunications infrastructure services in the United States that has resulted or will result in more than $10 million in revenues.

66.     Quanta's interpretation of the Agreement, as allowing Quanta to engage in the telecommunications infrastructure business in the United States as long as it receives revenues below $10 million per year, is contrary to the express terms of the Agreement.  That interpretation is also inconsistent with discussions between Dycom and Quanta during the negotiation of the Agreement, during which Quanta requested the $10 million exception to

protect it against *inadvertent* breaches of the non-compete provision.  The parties never intended

for Quanta *intentionally* to reenter the telecommunications infrastructure services business before

the four-year expiration of the non-compete covenant.

67.     Quanta also argued that the non-compete covenant only restricts it from

"providing telecommunications infrastructure services," and not from creating promotional

materials, holding itself out as a competitor in the industry, and actively competing against

Dycom for Telecom Customer's business.  This argument, however, ignores the actual language

of the Agreement, which broadly prohibits Quanta from "directly or indirectly" engaging in "*the*

*business* of providing" telecommunications infrastructure services.  The parties' use of the

phrase "the business" demonstrates their intent to have the non-compete covenant reach a wider

array of conduct than the mere provision of services.  Engaging in a business involves far more

than merely transacting with customers: it includes, for example, developing customer

relationships and conveying to potential customers that one is ready, willing, and able to be

hired.  Engaging in a business most certainly includes participating in a customer's competitive

bidding process and advertising one's services.

68.     In any event, while the full extent of Quanta's competitive conduct is exclusively

known to Quanta and will have to be investigated in discovery, the facts asserted in Dycom's

original letter and herein strongly support the inference that Quanta has already engaged – and

still is engaged – in "providing telecommunications infrastructure services to customers" in the

United States.  Tellingly, Quanta refused to give Dycom assurances that this is not, in fact, the

case.  Likewise, since this lawsuit was commenced, Quanta has refused to attend a Rule 26(f)

conference that would allow discovery to begin.

69.     Quanta also refused to respond to Dycom's request for assurances that Quanta personnel are not in contact with and attempting to solicit Dycom customers.  Instead, Quanta incorrectly insisted that it was permitted to "solicit potential customers" of telecommunications infrastructure services.

70.     On March 15, 2016, Dycom replied to Quanta's letter, noting that it failed to address Dycom's concerns.  Dycom gave Quanta one final opportunity to avoid litigation by providing the requested assurances and evidence.  Quanta did not respond.

### Dycom's Entitlement to Equitable Relief and Indemnification

71.     In the Agreement, Quanta expressly agreed that a breach of its non-compete covenant "would result in immediate and irreparable damage to the Purchaser," such that "the Purchaser shall be entitled to enforce the provisions of this Section 5.08 [the non-compete covenant] by means of injunctions, restraining orders and other equitable Actions."

72.     In another section of the Agreement, the parties similarly acknowledged and agreed "that they would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by any party hereto could not be adequately compensated by monetary damages alone and that the parties hereto would not have any adequate remedy at Law."

73.     Quanta thus agreed that Dycom "shall be entitled to enforce any provision of this Agreement (including Section 5.07 and 5.08 [the covenants against soliciting/hiring employees and competing in the Business]) by a decree of specific performance and to seek temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement."

74.     The availability of equitable remedies further entitles Dycom to an extension of the term of the non-compete covenant beyond December 3, 2016, for as long as Quanta has been in violation.

75.     In addition to equitable relief, the Agreement provides for indemnification: Quanta agreed that Dycom and its affiliates "shall be indemnified and held harmless by the Sellers" for all losses – including attorneys' and consultants' fees and expenses – "actually suffered or incurred by them . . . arising out of or resulting from . . . the breach of any covenant or agreement by the Sellers contained in this Agreement."

76.     Dycom is therefore entitled to indemnification for all losses suffered as a result of Quanta's breaches, including legal fees and costs incurred in this action.  This amount will be determined at trial, but far exceeds $75,000.  Among other things, the non-compete covenant was an essential element of the Agreement and was of significant value to Dycom.  If Dycom had known that Quanta would fail to fulfill its obligations under the Agreement, Dycom would not have agreed to pay more than $300 million to acquire Quanta's telecommunications subsidiaries. Likewise, Dycom would not have entered into the Agreement had it known that Quanta would seek to destroy the goodwill of the businesses that it transferred by soliciting those businesses' customers.  In its purchase-price accounting in connection with the transaction, Dycom allocated nearly $160 million in value to goodwill and the customer relationships it acquired.

77.     Under New York law, a contract to sell the goodwill of a business contains an implied covenant by the seller to refrain from soliciting former customers, which is in addition to any express non-compete covenant agreed to by the parties.  A violation of the implied covenant constitutes a fraud on the contract, and entitles the buyer to enjoin solicitation of customers and recover damages for a violation.  As demonstrated by its conduct with respect to Telecom

Customer, Quanta is actively soliciting a customer of a business it sold to Dycom in 2012, in violation of the implied covenant. On information and belief, Quanta is actively soliciting other customers in violation of the implied covenant as well. Moreover, through its hiring of Dycom employees with relationships with those customers, Quanta plainly is set on a course to continue the solicitation of those customers in the future.

### First Cause of Action: Breach of the Non-Compete Covenant

78.     Dycom repeats and re-alleges the allegations in paragraphs 1 through 77 of this amended complaint.

79.     By engaging in the Business before December 3, 2016, Quanta has violated the non-compete covenant in the Agreement.

80.     Dycom has been irreparably damaged by Quanta's breach and will suffer additional irreparable harm from Quanta's ongoing and future violations. Alternatively, Dycom has been or will be damaged in an amount to be determined at trial.

### Second Cause of Action: Breach of the Non-Solicit Covenant

81.     Dycom repeats and re-alleges the allegations in paragraphs 1 through 80 of this amended complaint.

82.     By soliciting and hiring Tom Harter before December 3, 2015, Quanta violated the covenant in the Agreement not to hire or solicit Dycom employees.

83.     Dycom has been irreparably damaged by Quanta's breach. Alternatively, Dycom has been or will be damaged in an amount to be determined at trial.

### Third Cause of Action: Breach of the Covenant Not to Use Confidential Information

84.     Dycom repeats and re-alleges the allegations in paragraphs 1 through 83 of this amended complaint.

85.     Quanta has solicited and hired multiple Dycom employees who possess sensitive, confidential, and proprietary information, including trade secrets, about and belonging to Dycom and the telecommunications businesses that it purchased from Quanta in 2012.

86.     On information and belief, in their new positions at Quanta, these employees have used and are continuing to use this information, including to aid Quanta in unlawfully competing against Dycom in violation of its non-compete covenant.

87.     This constitutes a violation of the Agreement, which required Quanta to cause its employees not to use confidential information and trade secrets belonging to the telecommunications infrastructure businesses sold to Dycom.

88.     Dycom has been irreparably damaged by Quanta's breach and will suffer additional irreparable harm from Quanta's ongoing and future violations.  Alternatively, Dycom has been or will be damaged in an amount to be determined at trial.

**Fourth Cause of Action: Declaration and Injunction Prohibiting Solicitation of Customers**

89.     Dycom repeats and re-alleges the allegations in paragraphs 1 through 88 of this amended complaint.

90.     Under New York law, a contract to sell the goodwill of a business contains an implied covenant by the seller to refrain indefinitely from soliciting former customers.  A violation of the implied covenant constitutes a fraud on the contract.

91.     In accordance with the Agreement, Quanta sold its shares in subsidiaries that constituted its U.S. telecommunications infrastructure services businesses, along with related assets and (among other things) a covenant not to compete for four years.  Quanta received total consideration exceeding $300 million.  In entering into the transaction, Quanta transferred the goodwill of the subsidiaries and businesses it sold.

92.     Upon information and belief, Quanta has been actively soliciting customers of the businesses it sold to Dycom in 2012, and intends to continue to do so in the future.

93.     An actual controversy exists between Dycom and Quanta regarding whether Quanta is prohibited from soliciting its former customers.  Quanta claims that it is and will be permitted to solicit those customers; Dycom submits that if Quanta does so, it will be in violation of the implied covenant.

94.     A declaration as to whether Quanta is prohibited from soliciting customers will help resolve the legal issues presented in this lawsuit and relieve the parties of uncertainty.

95.     Dycom is therefore entitled to a declaration under 28 U.S.C. § 2201(a) that Quanta's active solicitation of customers of the businesses sold to Dycom in 2012 – at any time following the sale, regardless of the duration of the express non-compete covenant – is a violation of the implied covenant in the Agreement and a fraud on the contract.

96.     In addition, Dycom has been irreparably damaged by Quanta's breach and will suffer additional irreparable harm from Quanta's ongoing and future violations, entitling Dycom to injunctive relief barring solicitation by Quanta.  Alternatively, Dycom has been or will be damaged in an amount to be determined at trial.

### Fifth Cause of Action: Tortious Interference with Contract

97.     Dycom repeats and re-alleges the allegations in paragraphs 1 through 96 of this amended complaint.

98.     Quanta has hired Dycom employees who were parties to valid employment agreements with Dycom.

99.     The employment agreements contain covenants against competing with Dycom following the employees' termination or resignation, and against using or disclosing Dycom's proprietary information and trade secrets.

26

100.     Quanta knew that the Dycom employees it hired were bound by these contractual obligations.

101.     On information and belief, Quanta intentionally induced the former Dycom employees it hired to violate these obligations in the course of their new employment with Quanta.  It did so for improper and unjustified purposes, including unlawfully competing against Dycom and unfairly making use of Dycom's confidential and proprietary information and trade secrets.

102.     Dycom has been irreparably damaged by Quanta's tortious conduct and will suffer additional irreparable harm from Quanta's ongoing and future misconduct.  Alternatively, Dycom has been or will be damaged in an amount to be determined at trial.

### Sixth Cause of Action: Indemnification

103.     Dycom repeats and re-alleges the allegations in paragraphs 1 through 102 of this amended complaint.

104.     The Agreement entitles Dycom to indemnification from Quanta for all losses – including attorneys' and consultants' fees – suffered by Dycom as a result of Quanta's breaches of any covenant or agreement in the Agreement.

105.     Dycom has suffered losses and may continue to suffer losses, in amounts to be determined at trial, as a result of Quanta's violations of the non-compete covenant, the non-solicit covenant, and the implied covenant not to solicit former customers.

106.     Dycom also has incurred and may continue to incur attorneys' fees and consultants' fees in connection with its enforcement of the Agreement, including this lawsuit, in amounts to be determined at trial.

107.     In accordance with the Agreement, Dycom is entitled to be indemnified and held harmless by Quanta for all of these losses, fees, and expenses.

### Request for Relief

WHEREFORE, plaintiff Dycom Industries, Inc. hereby requests:

1.  Entry of judgment in Dycom's favor on the claims asserted in this amended complaint;

2.  A declaration that Quanta is indefinitely barred from soliciting telecommunications infrastructure customers of the subsidiaries and businesses it sold to Dycom;

3.  A temporary, preliminary, and permanent injunction against further breaches by Quanta, including breaches of any express covenant in the Agreement and the implied covenant not to solicit customers of the subsidiaries and businesses Quanta sold to Dycom;

4.  An order extending the terms of covenants in the Agreement that Quanta has violated, for the length of time Quanta was in breach;

5.  Money damages or indemnification, in an amount to be proven at trial;

6.  Attorneys' fees and costs; and

7.  Any other and further relief that the Court deems just and proper.

Dated: April 28, 2016
New York, New York

MILBANK, TWEED, HADLEY & McCLOY LLP

By: _____

Scott A. Edelman
Alexander B. Lees
sedelman@milbank.com
alees@milbank.com
28 Liberty Street
New York, New York  10005-1413
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

*Attorneys for Plaintiff*