**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DYCOM INDUSTRIES, INC., | ECF CASE |
| Plaintiff, | No. 16-cv-2396 (VM) |
| - against - | |
| QUANTA SERVICES, INC., | <u>JURY TRIAL DEMANDED</u> |
| Defendant. | |

### ANSWER OF DEFENDANT QUANTA SERVICES, INC.
### TO THE AMENDED COMPLAINT AND COUNTERCLAIM

Defendant Quanta Services, Inc. ("Quanta"), by and through its undersigned counsel, hereby answers the allegations of plaintiff's Amended Complaint, filed April 28, 2016 (the "Amended Complaint" or "AC").

To the extent that the first unnumbered paragraph of the Amended Complaint requires a response, Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this unnumbered paragraph.  With respect to the numbered paragraphs of the Amended Complaint, Quanta answers as follows:

1.      Quanta denies the allegations asserted in paragraph 1, except admits that it entered into the Agreement[1] with Dycom in 2012 and respectfully refers the Court to the Agreement for the complete terms thereof.

---

[1]      Unless otherwise defined herein, capitalized terms have the same meanings as in the Amended Complaint.

2.      Quanta denies the allegations asserted in paragraph 2, except respectfully refers the Court to the Agreement for the complete terms thereof.

3.      Quanta denies the allegations asserted in paragraph 3, except respectfully refers the Court to the Agreement for the complete terms thereof.

4.      Quanta denies the allegations asserted in paragraph 4, except respectfully refers the Court to the Agreement for the complete terms thereof.

5.      Quanta denies the allegations asserted in paragraph 5, except states that the last sentence of paragraph 5 asserts legal conclusions to which no response is required.

6.      Quanta denies the allegations asserted in paragraph 6, except states that the Amended Complaint purports to seek indemnification, declaratory relief, and injunctive relief.

7.      Paragraph 7 asserts legal conclusions to which no response is required.

8.      Paragraph 8 asserts legal conclusions to which no response is required.

9.      Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 9.

10.     Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 10.

11.     Quanta admits the allegations asserted in paragraph 11.

12.     Quanta denies the allegations asserted in paragraph 12, except (a) respectfully refers the Court to the Agreement for the complete terms thereof, and (b) states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of paragraph 12.

13.     Quanta denies the allegations asserted in paragraph 13, and respectfully refers the Court to the Agreement for the complete terms thereof.

14.     Quanta denies the allegations asserted in paragraph 14, and respectfully refers the Court to the Agreement for the complete terms thereof.

15.     Quanta denies the allegations asserted in paragraph 15, and respectfully refers the Court to the Agreement for the complete terms thereof.

16.     Paragraph 16 asserts legal conclusions to which no response is required.  To the extent that paragraph 16 asserts any factual allegations, Quanta denies them.

17.     Quanta denies the allegations asserted in paragraph 17, except (a) respectfully refers the Court to the Agreement for the complete terms thereof, (b) states that the last sentence of paragraph 8 asserts a legal conclusion to which no response is required and (c) admits that the transaction closed on December 3, 2012.

18.     Quanta denies the allegations asserted in paragraph 18, except states that the last sentence of paragraph 18 contains legal conclusions to which no response is required.  To the extent that the last sentence of paragraph 18 asserts any factual allegations, Quanta denies them.

19.     Quanta denies the allegations asserted in paragraph 19, except states that Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in the first sentence of paragraph 19.

20.     Quanta denies the allegations asserted in paragraph 20, except states that (a) Engineering Associates was one of the entities sold by Quanta to Dycom in the 2012 transaction and (b) Quanta lacks knowledge or information sufficient to form a belief regarding the services currently provided by Engineering Associates.

21.     Quanta denies the allegations asserted in paragraph 21.

22.     Quanta admits that after joining Quanta, Rhys Harter sought to recruit certain employees from Engineering Associates, but denies the remaining allegations asserted in

paragraph 22, including any allegation that Rhys Harter's recruiting efforts involved a suggestion that those being recruited could perform telecommunications work for Quanta or its subsidiaries in the United States in violation of the SPA.  Quanta respectfully refers the Court to the letter quoted therein for a complete and accurate statement of its contents.

23.     Quanta denies the allegations asserted in paragraph 23.

24.     Quanta denies the allegations asserted in paragraph 24, and respectfully refers the Court to the employment agreement quoted therein for a complete and accurate statement of its contents.

25.     Quanta denies the allegations asserted in paragraph 25.

26.     Quanta denies the allegations asserted in paragraph 26, except states that it has hired individuals who had been employed by Dycom.

27.     Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 27, except admits that Dan Miller previously worked for Spalj Construction Company prior to December 2012, and that Dan Miller resigned from his position at Dycom on or about December 22, 2015.

28.     Quanta denies the allegations asserted in paragraph 28, except states that it lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in the last sentence of paragraph 28.

29.     Quanta denies the allegations asserted in paragraph 29.

30.     Quanta denies the allegations asserted in paragraph 30.

31.     Quanta denies the allegations asserted in paragraph 31, except states that Quanta lacks knowledge or information sufficient to form a belief as to the truth of allegations asserted in the second and last sentences of paragraph 31.

32.     Quanta denies the allegations asserted in paragraph 32, except states that Tom Hornick worked for Spalj at the time of its acquisition by Dycom in 2012.

33.     Quanta denies the allegations asserted in paragraph 33.

34.     Quanta denies the allegations asserted in paragraph 34, except admits that Gary Hornick holds a number of specialty licenses and began working for Quanta on or about April 11, 2016.

35.     Quanta denies the allegations asserted in paragraph 35, except states that Tonya Dobson, Christopher Brown, Johnny Rushing, and Karen Rushing were hired by Quanta on or about April 2016.

36.     Quanta denies the allegations asserted in paragraph 36, and respectfully refers the Court to the employment agreements referenced therein for a complete and accurate statement of their contents.

37.     Quanta denies the allegations asserted in paragraph 37, and respectfully refers to the Court to the agreements referenced therein for a complete and accurate statement of their contents.

38.     Quanta denies the allegations asserted in paragraph 38.

39.     Quanta denies the allegations asserted in paragraph 39.

40.     Quanta denies the allegation asserted in paragraph 40.

41.     Quanta denies the allegations asserted in paragraph 41, and respectfully refers the Court to the website quoted therein for a complete and accurate statement of its contents.

42.     Quanta denies the allegations asserted in paragraph 42, and respectfully refers the Court to the corporate filings quoted therein for a complete and accurate statement of their contents.

43.     Quanta denies the allegations asserted in paragraph 43, and respectfully refers the Court to the email quoted therein for a complete and accurate statement of its contents.

44.     Quanta denies the allegations asserted in paragraph 44, and respectfully refers the Court to the email quoted therein for a complete and accurate statement of its contents.

45.     Quanta denies the allegations asserted in paragraph 45, and respectfully refers the Court to the text message quoted therein for a complete and accurate statement of its contents.

46.     Quanta denies the allegations asserted in paragraph 46.

47.     Quanta denies the allegations asserted in paragraph 47, except states, upon information and belief, that Telecom Customer has announced that it was seeking to retain contractors to perform telecommunications infrastructure work, including engineering, design, and construction of a fiber optic network.

48.     Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 48.

49.     Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 49, except states that a Quanta subsidiary received an RFP from Telecom Customer for a project in California.

50.     Quanta denies the allegations asserted in paragraph 50, and respectfully refers the Court to the schedule referenced therein for a complete and accurate statement of its contents.

51.     Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 51, except states that Telecom Customer scheduled a "pre-bid meeting" for February 19, 2016.

52.     Quanta denies the allegations asserted in paragraph 52, except states that (a) George Bradshaw and Tom Cornett were present for but left before the beginning of a February

19, 2016 pre-bid meeting and (b) upon information and belief, Walt Donovan and John Xanthos attended the same meeting.

53.     Quanta denies the allegations in paragraph 53, except that it states that (a) it lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53 regarding what Dycom did or knew, and regarding what Telecom Customer knew or believed or placed on its website, (b) it admits that its subsidiary Potelco received an RFP from Telecom Customer on or about April 2016, and ultimately responded to Telecom Customer as to power make-ready services, and (c) Quanta denies that it acts through Potelco.

54.     Quanta denies the allegations asserted in paragraph 54.

55.     Quanta denies the allegations asserted in paragraph 55.

56.     Quanta denies the allegations asserted in paragraph 56.

57.     Quanta denies the allegations asserted in paragraph 57.

58.     Quanta denies the allegations asserted in paragraph 58, except states that the last sentence of paragraph 58 contains a legal conclusion to which no response is required.  To the extent that the last sentence of paragraph 58 asserts any factual allegations, Quanta denies them.

59.     Quanta denies the allegations asserted in paragraph 59.

60.     Quanta denies the allegations asserted in paragraph 60, and respectfully refers the Court to the letter cited therein for a complete and accurate statement of its contents.

61.     Quanta denies the allegations asserted in paragraph 61, and respectfully refers the Court to the letter cited therein for a complete and accurate statement of its contents.

62.     Quanta denies the allegations asserted in paragraph 62, and respectfully refers the Court to the letter and emails cited therein for a complete and accurate statement of their contents.

63.     Quanta denies the allegations asserted in paragraph 63, and respectfully refers the Court to the letter quoted therein for a complete and accurate statement of its contents.

64.     Quanta denies the allegations asserted in paragraph 64, and respectfully refers the Court to the letter quoted therein for a complete and accurate statement of its contents.

65.     Quanta denies the allegations asserted in paragraph 65.

66.     Quanta denies the allegations asserted in paragraph 66, and respectfully refers the Court to the Agreement for the complete terms thereof.

67.     Quanta denies the allegations asserted in paragraph 67, and respectfully refers the Court to the letter and Agreement for a complete and accurate statement of their contents.

68.     Quanta denies the allegations asserted in paragraph 68, and states that the parties held a Rule 26(f) conference on May 16, 2016.

69.     Quanta denies the allegations asserted in paragraph 69, and respectfully refers the Court to the letter quoted therein for a complete and accurate statement of its contents.

70.     Quanta denies the allegations asserted in paragraph 70, and respectfully refers the Court to the letter cited therein for a complete and accurate statement of its contents.

71.     Quanta denies the allegations asserted in paragraph 71, and respectfully refers the Court to the Agreement for the complete terms thereof.

72.     Quanta denies the allegations asserted in paragraph 72, and respectfully refers the Court to the Agreement for the complete terms thereof.

73.     Quanta denies the allegations asserted in paragraph 73, and respectfully refers the Court to the Agreement for the complete terms thereof.

74.     Paragraph 74 asserts legal conclusions to which no response is required.  To the extent that paragraph 74 asserts any factual allegations, Quanta denies them.

75.     Quanta denies the allegations asserted in paragraph 75, and respectfully refers the Court to the Agreement for the complete terms thereof.

76.     Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 76, except states that the first sentence of paragraph 76 asserts legal conclusions to which no response is required.

77.     Quanta denies the allegations asserted in paragraph 77, except states that the first two sentences of paragraph 77 assert legal conclusions to which no response is required.  To the extent that the first two sentences of paragraph 77 assert any factual allegations, Quanta denies them.

78.     Quanta repeats and re-alleges each and every response to the allegations asserted in paragraph 1 through 77 of the Amended Complaint.

79.     Quanta denies the allegations asserted in paragraph 79.

80.     Quanta denies the allegations asserted in paragraph 80.

81.     Quanta repeats and re-alleges each and every response to the allegations asserted in paragraph 1 through 80 of the Amended Complaint.

82.     Quanta denies the allegations asserted in paragraph 82.

83.     Quanta denies the allegations asserted in paragraph 83.

84.     Quanta repeats and re-alleges each and every response to the allegations asserted in paragraph 1 through 83 of the Amended Complaint.

85.     Quanta denies the allegations asserted in paragraph 85, except states that it has hired individuals who had been employed by Dycom.

86.     Quanta denies the allegations asserted in paragraph 86.

87.     Quanta denies the allegations asserted in paragraph 87.

88. Quanta denies the allegations asserted in paragraph 88.

89. Quanta repeats and re-alleges each and every response to the allegations asserted in paragraph 1 through 88 of the Amended Complaint.

90. Paragraph 90 asserts legal conclusions to which no response is required. To the extent that paragraph 90 asserts any factual allegations, Quanta denies them.

91. Quanta denies the allegations asserted in paragraph 91, and respectfully refers the Court to the Agreement for the complete terms thereof.

92. Quanta denies the allegations asserted in paragraph 92.

93. Quanta admits the allegations asserted in paragraph 93.

94. Quanta admits the allegations asserted in paragraph 94.

95. Quanta denies the allegations asserted in paragraph 95.

96. Paragraph 96 asserts legal conclusions to which no response is required. To the extent that paragraph 96 asserts any factual allegations, Quanta denies them.

97. Quanta repeats and re-alleges each and every response to the allegations asserted in paragraph 1 through 96 of the Amended Complaint.

98. Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 98.

99. Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations asserted in paragraph 99, and respectfully refers the Court to the agreements referenced therein for a complete and accurate statement of their content.

100. Quanta denies the allegations asserted in paragraph 100.

101. Quanta denies the allegations asserted in paragraph 101.

102. Quanta denies the allegations asserted in paragraph 102.

103.    Quanta repeats and re-alleges each and every response to the allegations asserted in paragraph 1 through 102 of the Amended Complaint.

104.    Quanta denies the allegations asserted in paragraph 104, and respectfully refers the Court to the Agreement for the complete terms thereof.

105.    Quanta denies the allegations asserted in paragraph 105.

106.    Quanta lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106.

107.    Quanta denies the allegations asserted in paragraph 107.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof it would not otherwise bear, Quanta asserts the following affirmative and other defenses.  Quanta reserves the right to assert further defenses as the case proceeds.

### FIRST DEFENSE

Plaintiff's claims in its Fourth Cause of Action (Declaration and Injunction Prohibiting Solicitation of Customers) are barred, in whole or in part, because it lacks standing to assert those claims.

### SECOND DEFENSE

By reason of plaintiff's tortious misconduct and/or unclean hands, plaintiff may not enforce or seek a declaration of purported rights under the Agreement and is not entitled to injunctive or other equitable relief.

### THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches, estoppel and/or, waiver.

## FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because its alleged damages, if any, are speculative and uncertain.

## FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by its failure to mitigate damages.

## SIXTH DEFENSE

Plaintiff's claims in its Fourth Cause of Action (Declaration and Injunction Prohibiting Solicitation of Customers) are barred, in whole or in part, because the declaration sought would indefinitely preclude a competitor from competing in a highly concentrated market, and is therefore against public policy and barred by the doctrine of illegality.

## SEVENTH DEFENSE

Plaintiff's claims, to the extent they seek an extension of the non-compete provisions beyond their contractual term, are barred, in whole or in part, because the relief sought would unreasonably preclude a competitor from competing in a highly concentrated market, and is therefore against public policy and barred by the doctrine of illegality.

## QUANTA'S COUNTERCLAIM AGAINST DYCOM

Quanta, by and through its undersigned attorneys, allege for their Counterclaim against Dycom, upon knowledge as to themselves and their own acts and upon information and belief as to all other matters, as follows:

1.      Dycom's Amended Complaint relies on misstatements of fact, misrepresentations about the terms of the contract between Dycom and Quanta, and pure, unfounded speculation. To the extent there was any doubt, Dycom's issuance of a press release "announcing" the

Amended Complaint not at the time it was filed, but on the day of Quanta's earnings call makes clear that Dycom's real motive is to attempt to use this lawsuit to gain a benefit that it never bargained for or obtained in the November 2012 Stock Purchase Agreement among Quanta, Dycom, InfraSource FI, LLC and PBG Acquisition III, LLC (the "SPA"):  an extension of the non-compete provision of the SPA beyond December 3, 2016.

2.      The SPA expressly contemplated that Quanta and its subsidiaries would continue to provide telecommunications infrastructure services in the U.S. (subject to certain limitations) for the four years after the sale of certain subsidiaries to Dycom in 2012 and on an unlimited basis after that four year period.  Dycom's allegations establish nothing more than that Quanta is taking steps to prepare itself in anticipation of the expiration of that four-year period.  And Dycom fails to identify any legally cognizable harm it could possibly have suffered as a result of those activities.

3.      Dycom's claim that the activities of certain Quanta subsidiaries that are not parties to the SPA implicate New York's Mohawk doctrine is similarly unfounded.  First and foremost, no Quanta operating subsidiary was a party to the SPA, and no current Quanta subsidiary sold any goodwill of its existing customers to Dycom.  Accordingly, the necessary predicate to the application of the doctrine is absent.   In addition, both the nature of the U.S. telecommunications infrastructure industry and the specific terms of the SPA allowing even Quanta itself to remain in that industry after the 2012 transaction with Dycom demonstrate that the parties understood that Quanta would retain its customer relationships after the sale.

**FACTUAL ALLEGATIONS RELATED TO COUNTERCLAIM**

4.      Through well over 100 operating subsidiaries, Quanta and its subsidiaries provide contracting services, offering infrastructure solutions primarily to the electric power, oil and gas,

and telecommunications industries in the United States, Canada, Latin America, and Australia and select other international markets.  The services that Quanta and its subsidiaries provide include the design, installation, upgrade, repair and maintenance of infrastructure within each of the industries it serves, such as electric power transmission and distribution networks, substation facilities, renewable energy facilities, pipeline transmission and distribution systems and facilities, and infrastructure services for the offshore and inland water energy markets.

5.      Telecommunications infrastructure services work is generally commoditized and concentrated among a small number of large customers.  Typically, the process is initiated by customers, and not by providers.  Customers ordinarily issue an initial solicitation (otherwise known as a request for proposal ("RFP")) for a specific project to a group of prequalified potential service providers.   The RFP includes information about the project and requests that potential bidders submit certain information.  Multiple providers may respond to the RFP, and the process may include additional rounds of solicitation by the customer of additional information and pricing proposals from the providers.  The potential customer will then select the provider.  Generally, price is the most important factor in selecting the provider.  Customers often have multiple projects going forward at any given time, and they often use different providers for the same services on different projects.  The selection of one provider for one project does not preclude a different provider from competing for and getting a contract for a different project for the same customer.

6.      Quanta's operating subsidiaries perform a variety of services for their customers, and multiple operating subsidiaries often perform services for the same customer.

7.      Dycom and many of Dycom's subsidiaries are and have been competitors of Quanta and many of its subsidiaries.

8.     In 2012, Dycom bought from Quanta 17 subsidiaries related to the telecommunications industry in the U.S.  None of these 17 subsidiaries was a party to the SPA.

9.     In the SPA, the parties expressed their understanding and intention that Quanta and its subsidiaries could continue to work in the U.S. telecommunications market with certain conditions.  For example, Section 5.08 of the SPA limits, but does not prohibit, Quanta and its subsidiaries from providing telecommunications infrastructure services in the U.S. for a period of four years (the "Restricted Period").  Specifically, the SPA states that Quanta:

> shall not be deemed to be in violation of this Section 5.08 as a result of (i) performing their obligations under this Agreement or the Ancillary Agreements, (ii) acquiring any Person or business that engages in the Business so long as (1) the Business contributed less than 25% or more of the average total annual revenue of such Person or business for the two fiscal years prior to the time of the acquisition and (2) the total annual revenue derived from the Business of all Persons or businesses acquired pursuant to the exception in this clause (ii) since the Closing Date remains less than $75 million, (iii) providing telecommunication infrastructure services pursuant to the contracts or agreements, in each case identified in Section 5.08(a) of the Disclosure Schedule until the expiration or termination of such contracts or agreement in accordance with its existing terms with respect to scope and territory (iv) any other services performed for any telecommunications customer(s) contributing revenues not in excess of $10 million in any fiscal year of Quanta, and (v) as contemplated by the Restructuring Transactions.

10.    Additionally, the parties agreed in the SPA that there would be no restriction on Quanta's and its subsidiaries' ability to perform select telecommunications infrastructure services in the U.S., including:

> (i) power make-ready services related to telecommunications infrastructure, (ii) telecommunications infrastructure services integrated with the operation of overhead or underground electric power infrastructure or pipeline infrastructure for electric power or pipeline customers, or (iii) services to engineer, design, construct, maintain or repair telecommunications infrastructure when performed in conjunction with non-telecommunications services for any customer whose business is not primarily the provision of telecommunications services.

11.    Further, the SPA places no similar restriction on Quanta's and its subsidiaries' ability to provide telecommunications infrastructure services outside the U.S., other than

15

working with Saskatchewan Telecommunications Holding Corporation and its subsidiaries in Canada.  Moreover, the Restricted Period does not apply to the majority of services provided by Quanta's subsidiaries because those services fall outside of the definition "Business" subject to Section 5.08 of the SPA.  Pursuant to the terms of the SPA, the Restricted Period will end on December 3, 2016.

12.      In addition to the non-compete provision, Section 5.07 of the SPA contains a non-solicitation provision which states that for three years after the closing of the transaction, Quanta would not solicit employees of the subsidiaries that it sold to Dycom.  This non-solicitation provision expired on December 3, 2015.  By the clear terms of the agreement, the non-solicitation provision expired one year before the non-compete provision.  Both parties agreed that under those terms it was a reasonable possibility that Quanta could begin preparing to fully reenter the U.S. telecommunications infrastructure market in advance of the expiration of the non-competition provision.

13.      Upon the closing of the transactions contemplated by the SPA, it was understood among the parties that the Quanta operating subsidiaries that were not sold to Dycom could continue to provide services to their customers, including telecommunications infrastructure services, provided that the provision of such services was consistent with Section 5.08 of the SPA.

14.      In the SPA, the parties did not intend to restrict the right of Quanta or Quanta's remaining subsidiaries to solicit business from customers of the subsidiaries sold to Dycom. Indeed, many of the customers of the subsidiaries sold to Dycom were, at the time the parties executed the SPA, also customers of other Quanta subsidiaries.  Many of those customers have remained customers of Quanta and its various subsidiaries in the four years since the SPA was

executed.  Upon information and belief, Dycom is fully aware that those customers have engaged

Quanta subsidiaries since the execution of the SPA and has made no complaint until now –

months before the non-compete is to expire.

15.     Dycom's allegations regarding the Telecom Customer[2] are also incorrect.  In

February 2016, the Telecom Customer sent an RFP to Underground Construction Co., Inc.

("UCC"), a subsidiary of Quanta at the time the SPA was executed, requesting that UCC submit

a proposal for a telecommunications infrastructure services project in California.  The RFP

contained a timeline for responding to the RFP, but did not specify when the project would begin

or when the project would be completed.  Additionally, Telecom Customer informed UCC that

Dycom and its subsidiaries had advised Telecom Customer that no Dycom company would be

bidding on the project.  On information and belief, Dycom and its subsidiaries did not intend to

submit a bid in response to the RFP because one of Dycom's other clients objected to Dycom

and its subsidiaries working on the specific project.

16.     With the understanding that the only project on the agenda was one that Dycom

would not bid for, two employees of UCC attended Telecom Customer's preliminary meeting

regarding the RFP.  (See AC ¶ 52.)  At the beginning of the meeting, Telecom Customer

disclosed that additional projects would also be under discussion.  The two UCC employees then

left the meeting.  UCC later informed Telecom Customer that it would not participate in the

auction for the project.

17.     Dycom's allegations about Telecom Customer's April 2016 RFP are also

misleading and incomplete.  Quanta subsidiary Potelco received an RFP from Telecom Customer

---

[2]     Quanta's general understanding of the identity of the "Telecom Customer" referenced in Dycom's Amended
        Complaint is based on pre-suit written correspondence between Quanta and Dycom, but Dycom has to this
        point not informed Quanta of the specific entity to which "Telecom Customer" refers.

on or about April 2016.  Potelco responded to the RFP with respect to power make-ready

services, which is expressly permitted under the non-compete in the SPA.

18.    Dycom's allegations about Potelco appear to rest largely on the content of

Potelco's website.  As Dycom likely is aware, Potelco's website has not changed materially since

the SPA was signed in 2012.  Potelco's inadvertent failure to remove content from its website

does not constitute engaging in "Business," as that term is defined in the SPA, and Quanta

cannot be held liable for such inadvertent omission by its subsidiary.

19.    Contrary to Dycom's argument, added to its amended complaint filed on April 28,

2016, the facts of this case fall outside the limited confines of the Mohawk doctrine.  (See AC ¶ 5

(citing Mohawk Maint. Co. v. Kessler, 52 N.Y.2d 276 (1981).)

20.    First, Quanta's operating subsidiaries were not parties to the SPA and therefore

did not sell any goodwill to Dycom.  To the contrary, Section 11.09 of the SPA specifically

provides that it will only be binding upon the direct parties to the agreement.  And Section 11.15

of the SPA provides that Quanta's remaining subsidiaries and other defined Non-Party Affiliates

would not have "any liability (whether in contract or in tort, at law or in equity . . .) for any

obligations or liabilities arising under, in connection with or related to [the SPA] or for any claim

based on, in respect of, or by reason of [the SPA] or its negotiation or execution; and each party

hereto waives and releases all such liabilities, claims and obligations against such Non-Party

Affiliates."  Accordingly, Quanta's operating subsidiaries are not bound by the principles set

forth in Mohawk as to the customers of the entities sold to Dycom by Quanta, and Dycom

waived and released any such claim against them.

21.    Second, because the parties expressly agreed in the SPA that Quanta and its

subsidiaries could participate in the U.S. telecommunications infrastructure industry after the

2012 transaction, Dycom cannot contend that the transaction transferred the goodwill of the Acquired Companies' customers.

22.     Third, the nature of the telecommunications infrastructure industry is fundamentally different from the type of customer relationship at issue in <u>Mohawk</u>.  In that case, the business – commercial building maintenance – was one in which customers select one provider to the exclusion of all others.  In the telecommunications infrastructure industry, customers will often hire multiple infrastructure service providers.  And those service providers often have additional business relationships with the customers that do not involve telecommunications infrastructure services.  Given this dynamic, Dycom and its subsidiaries have performed telecommunications infrastructure services work for most of the large telecommunications customers that make up the industry, as have Quanta and its subsidiaries. Dycom now wants to prevent Quanta and its subsidiaries from performing work for any of these customers indefinitely, which would effectively prevent Quanta and its subsidiaries from participating in the industry in any meaningful way.  Such a position is at odds with the rights that the parties negotiated under the SPA, and against public policy.

23.     Fourth, even if <u>Mohawk</u> were to apply in principle, it would not apply to UCC's interaction with Telecom Customer as alleged by Dycom.  <u>Mohawk</u> expressly permits the seller of a business to accept an engagement from its former customer provided it does not impermissibly solicit that engagement.  Dycom alleges only that UCC responded to a solicitation from Telecom Customer (the RFP), but the doctrine does not prohibit a seller from responding to a former customer's RFP with factual information regarding the proposed project.  And even if UCC had thereafter submitted a bid in response to the former customer's solicitation, that would not have constituted an impermissible solicitation by UCC.

19

24.     Finally, because Dycom did not intend to submit a bid in response to the Telecom Customer's February 2016 RFP, had Quanta or its subsidiaries submitted a bid in response to the RFP, the bid would not have interfered with Dycom's purported goodwill as to Telecom Customer.  Similarly, where Dycom or its subsidiaries are precluded from bidding for a project or have abandoned a particular market and Quanta or its subsidiary submits bids in response to RFPs from those customers, Quanta's or its subsidiaries' bid cannot interfere with any purported goodwill that Dycom has as to that customer.

**First Counterclaim Cause of Action Against Dycom:**
**Declaration of the Inapplicability of Mohawk**

25.     Quanta repeats and incorporates herein by reference the allegations in the preceding paragraphs of this Counterclaim.

26.     Pursuant to the Federal Declaratory Judgment Act, 28 USC § 2201, Quanta seeks a determination of the parties' respective rights and obligations with regard to the solicitation of customers of the 17 subsidiaries that were sold by Quanta to Dycom when the Restricted Period ends.

27.     Based on the foregoing allegations, there exists between the parties a substantial controversy of sufficient immediacy and reality to warrant declaratory relief.

28.     Quanta seeks a declaratory judgment that Mohawk is not applicable to Quanta and its subsidiaries and affiliates.

**JURY DEMAND**

Quanta hereby requests a trial by jury on Dycom's fifth cause of action (tortious interference with contract).

## PRAYER FOR RELIEF

**WHEREFORE**, Quanta prays as follows:

1.      That Dycom take nothing by reason of its Amended Complaint and that judgment be rendered in favor of Quanta;

2.      That Quanta be awarded its costs and disbursements, including attorneys' fees, incurred in defending this action;

3.      For a declaration that Quanta's subsidiaries' solicitation of customers who had previously been customers of the 17 subsidiaries that it sold to Dycom does not violate Mohawk Maint. Co. v. Kessler, 52 N.Y.2d 276 (1981) and its progeny; and

4.      For such other relief as the Court deems proper.

21

Dated: May 26, 2016                    Respectfully submitted,

                                        /s/ Christopher P. Malloy
                                        Christopher P. Malloy
Scott D. Musoff
David E. Schwartz
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
scott.musoff@skadden.com
david.schwartz@skadden.com
christopher.malloy@skadden.com

*Attorneys for Defendant Quanta Services, Inc.*

929178-NYCSR06A - MSW